UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

SHARMAINE MEADOWS,

Defendant.

Case No. 26-CR-90 (SRN/ECW)

**DEFENDANT'S CONSOLIDATED RESPONSE IN OPPOSITION TO GOVT'S ADDENDUM TO NOTICE (DOC. 55), AND SUPPLEMENTAL TRIAL BRIEF (DOC. 56)**

The Superseding Indictment charges a scheme to defraud a single Medicaid program — the Housing Stabilization Services ("HSS") Program — through five specified executions under 18 U.S.C. §§ 1347 and 2. The Government's two supplemental filings ask the Court to expand the trial far beyond those charges in three ways: (1) by admitting evidence of purported fraud in a separate Medicaid program — the Individualized Home Supports ("IHS") Program — as "intrinsic" to the charged HSS scheme, or alternatively under Rule 404(b); and (2) by admitting out-of-court statements of Cradle of Love ("Cradle") management under Rule 801(d)(2)(E) before the Government has laid the foundation the Rule requires.

Each of the Government's requests overreach. The IHS-program evidence is not part of the charged HSS executions; under controlling Eighth Circuit law it is extrinsic and must satisfy Rule 404(b), which it cannot. Much of the proffered conduct is the alleged wrongdoing of Cradle employees, not "other acts" of Ms. Meadows, and the Government's theory — that she kept money from known fraud — is propensity reasoning that Rule 404(b) forbids. Finally, the co-schemer statements cannot be admitted unless and until the Government proves, by a preponderance, a joint scheme to defraud and that each statement was made in furtherance of it.

Ms. Meadows respectfully requests that the Court (1) exclude the IHS-program and separate-program financial evidence as non-intrinsic evidence and inadmissible 404(b) evidence; and (2) require the Government to satisfy the *Bell* foundation, statement by statement, before any Rule 801(d)(2)(E) declaration reaches the jury.

## BACKGROUND

The Superseding Indictment alleges that Ms. Meadows, through Cradle, defrauded the HSS Program — a Medicaid program administered by the Minnesota Department of Human Services ("DHS") — between August 2020 and October 2025, receiving approximately $3.7 million based on false and fraudulent claims. It adds Counts 4 and 5 which concern two HSS claims submitted in October 2022 for beneficiary "M.F."

The Addendum (Doc. 55) seeks to introduce two categories of additional evidence. First, evidence concerning the IHS Program — a different DHS program — centered on Cradle caseworker Kaleb Dowd, and caseworker Kinyatta Henry who allegedly falsified IHS hours for beneficiary "O.S." in October–December 2022 – though apparently beneficiary "O.S." has not even been interviewed as the Government has not produced to the Defense any corresponding 302 interview reports in discovery. The Government contends Ms. Meadows learned of these employees' suspected falsifications, docked their pay, yet did not reverse the associated Medicaid billing. Second, evidence that payments for multiple Medicaid programs were "intermingled" in Cradle accounts for which Ms. Meadows was the sole signatory. The Government offers both categories as "inextricably intertwined," and alternatively under Rule 404(b). In neither category has the Government presented any evidence whatsoever that Meadows either directed or even knew of any false or inaccurate billing submissions to Medicaid.

The Supplemental Trial Brief (ECF No. 56) argues that the Government may prove uncharged executions of the HSS scheme as intrinsic evidence; and that statements by Cradle CFO Tony Davis and former biller Latrice Osborne (Ushie) are admissible under Rule 801(d)(2)(E) even though no conspiracy is charged. Again, the Government's position is without merit – at the pretrial conference, the Government suggested that testimony by Mr. Davis may expose him to criminal liability – though when they interviewed him, they made no suggestion that he was a target, a subject, or otherwise in jeopardy whatsoever. The government has interviewed both Davis and Osborne and have declined to call them as witnesses – and moreover has effectively made them *unavailable* as witnesses. A letter describing the scenario from counsel for Mr. Davis is attached here as Exhibit 1 (marked for trial purposes as Defendant's Exhibit 32). The backdoor attempt to introduce their statements goes squarely against Meadows' right to confront witnesses against her, and the request to introduce those statements is without merit.

## ARGUMENT

### I. The IHS Program Evidence is Not Intrinsic to the Charged HSS Scheme and Must be Analyzed under Rule 404(b).

The Government's lead theory is that the IHS-program evidence is "intrinsic" and therefore escapes Rule 404(b) entirely. That theory misapplies the narrow Eighth Circuit intrinsic-evidence doctrine. The intrinsic category is confined to acts that are part of the charged offense. Evidence is intrinsic only where the "act itself is part of the charged offense," and such evidence is admissible because it "completes the story" of the charged crime, "logically . . . prove[s] any element," or shows consciousness of guilt. *United States v. Grady*, 88 F.4th 1246 (8th Cir. 2023). The doctrine reaches conduct that is "part of the charged offense" and provides "context" for how or why it happened — nothing more. *United States v. Alvarez-Sorto*, 160 F.4th

930 (8th Cir. 2025). Separate, discrete misconduct that "provides no additional context for the crimes charged" is not intrinsic. *United States v. Forcelle*, 86 F.3d 838 (8th Cir. 1996).

In *Forcelle*, a District of Minnesota fraud prosecution, the Eighth Circuit reversed a conviction because the Government had introduced evidence that the defendant separately stole platinum from the same employer as "part of a series of criminal acts serving to defraud the company." *Forcelle*, 86 F.3d 838 (8th Cir. 1996). The court held that the platinum theft was "entirely distinct from the charges" and that proof of the charged fraud "does not incidentally involve" proof of the separate misconduct. *Id.* The Government's generic argument that the evidence was "part of a series of criminal acts" was "simply a repetition of the standard for admitting evidence of other crimes and does not explain how the evidence meets the standard." *Id.*

The same is true here. The charged crimes are five HSS executions concerning four specified beneficiaries. The IHS Program is a separate program, with separate claims, submitted to a separate DHS payment stream. Proof that Cradle submitted false HSS claims for M.F. in October of 2022 "does not incidentally involve" proof that employee Kinyatta Henry falsified IHS hours for O.S. The IHS conduct "provides no additional context for the crimes charged"; it is, at most, "a discrete example" of separate alleged misconduct. *Forcelle*, 86 F.3d 838 (8th Cir. 1996).

Where conduct "occurred at other times" and lacked a charged conspiracy or some other way to connect it with the charged offenses, nothing inextricably intertwines the two. *Alvarez-Sorto,* 160 F.4th 930 (8th Cir. 2025). Evidence of a defendant's involvement with an "unrelated" operation "does not complete the story of the crime charged" and is not intrinsic. *Grady*, 88 F.4th 1246 (8th Cir. 2023). And other-acts evidence is not "an integral part of the immediate context of

the crime charged" when it does not "tend[] logically to prove any element of the crime charged." *United States v. White Plume*, 847 F.3d 624 (8th Cir. 2017). There is no conspiracy charged here, and the Government identifies no link that makes IHS billing an element of, or context for, the charged HSS executions. The overlap it invokes — shared employees and one shared beneficiary — is not the "same transaction"; it is precisely the kind of thematic similarity that *Forcelle* held insufficient.

Courts have warned that the "complete the story" gloss threatens to override Rule 404(b), because it cannot be that all evidence tending to prove the crime is part of the crime. If that were so, Rule 404(b) would be a nullity. *United States v. Ameri*, 297 F. Supp. 2d 1168 (E.D. Ark. 2004). Treating the IHS evidence as intrinsic would relieve the Government of Rule 404(b)'s notice requirement and the Court of its duty to give a limiting instruction — the very consequences that make the intrinsic label so easily abused. *Id.* The Court should hold that the IHS-program evidence is extrinsic and analyze it under Rule 404(b).

## II. The IHS Program Evidence Fails Rule 404(b) and Rule 403.

Analyzed correctly under Rule 404(b), the IHS evidence is inadmissible. Other-act evidence is admissible only if "(1) it is relevant to a material issue; (2) it is similar in kind and not overly remote in time to the crime charged; (3) it is supported by sufficient evidence; and (4) its potential prejudice does not substantially outweigh its probative value." *United States v. Zephier*, 180 F.4th 1135 (8th Cir. 2026). The evidence must be offered for a genuine non-propensity purpose; a court will reverse "when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." *Id.*

### A. Much of the proffered conduct is the employees' acts, not Ms. Meadows' "other acts."

Rule 404(b) governs "[e]vidence of a crime, wrong, or other act" by a defendant. *United States v. Golding*, 833 F.3d 914 (8th Cir. 2016). The falsification of IHS hours is alleged to be the conduct of Henry and Dowd. In *Golding*, a health care fraud prosecution materially like this one, the Eighth Circuit held that proposed testimony about other employees' misconduct was properly excluded as "irrelevant to any element of the charged crime," because relevance is measured against "what elements must be proven under the statute of conviction." *Id.* A co-actor's knowledge and intent "[are] not necessarily relevant to a material issue of the government's case-in-chief." *United States v. Hernandez*, No. 4:21-CR-3009, 2024 WL 4932089 (D. Neb. Dec. 2, 2024). The employees' alleged falsifications are not Ms. Meadows' "other acts" and do not become her acts simply because she signed the Cradle account. *Golding*, 833 F.3d 914 (8th Cir. 2016).

### B. The Government's real purpose is propensity.

Stripped of its labels, the Government's theory is that because Ms. Meadows allegedly kept money from known fraud in the IHS Program, she must have done the same in the HSS Program. That is the forbidden inference — once a fraudster, always a fraudster. Where the only genuine dispute is whether the charged acts occurred, "motive, accident, and mistake" are "not at issue," and prior-acts evidence "does no more than show" propensity, which Rule 404(b) prohibits. *United States v. Sumner*, 119 F.3d 658 (8th Cir. 1997). Intent is "not at issue" when a defendant "specifically denies only the criminal act." *Id.* To the extent Ms. Meadows contests whether the charged HSS claims were false at all, the IHS evidence adds nothing but character.

The Government's own contrasting authority proves the point. Where the Eighth Circuit has admitted other-acts evidence to show knowledge in a § 1347 case, the evidence was the defendant's own prior regulatory investigation bearing directly on willfulness, admitted with a limiting instruction. *Golding*, 833 F.3d 914 (8th Cir. 2016). The IHS evidence is not of that character: it is employees' conduct offered to paint Ms. Meadows as someone who tolerates fraud.

### C. Rule 403 independently bars the evidence.

Even relevant other-act evidence "must still pass" Rule 403 and should be excluded where its probative value is substantially outweighed by "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Hernandez*, No. 4:21-CR-3009, 2024 WL 4932089 (D. Neb. Dec. 2, 2024). Unfair prejudice is the "capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the charged offense." *Id.*

Admitting the IHS-program evidence would force a series of mini-trials on a separate program — whether Henry and Dowd in fact falsified IHS hours, what Ms. Meadows knew, and why particular claims were not reversed. The Eighth Circuit endorses excluding marginally probative other-acts evidence precisely to avoid "conducting mini trials on the detailed facts" of uncharged conduct and to keep the trial "focus[ed] . . . on the offense at issue." *White Plume*, 847 F.3d 624 (8th Cir. 2017). *Forcelle* is again instructive: there, the separate-misconduct evidence consumed roughly half the trial transcript and involved a far larger loss than the charged conduct, and the court could not say it "did not influence the jury's verdict." *Forcelle*, 86 F.3d 838 (8th Cir. 1996). The Government's proffer here — including inflammatory evidence of "more than 50

days of claims for greater than 20 hours of work each day"— presents the same risk of a trial about Cradle's general operations rather than the five charged executions.

### III. The Separate-Program Financial-Intermingling Evidence Should be confined to the HSS Program.

The Government seeks to show that Medicaid payments for multiple programs were aggregated in Cradle accounts. To the extent this evidence traces HSS proceeds, the defense does not dispute its general relevance. But evidence that sweeps in non-HSS program funds risks inviting the jury to infer guilt from Cradle's involvement in other programs — a ground "different from proof specific to the charged offense." *Hernandez*, 2024 WL 4932089 (D. Neb. Dec. 2, 2024). The Court should require the Government to limit its financial proof, through redaction or witness instruction, to the HSS claims and proceeds at issue, and should exclude the separate-program financial narrative under Rule 403.

### IV. The Government May Prove the HSS Scheme, but Its Proof Remains Subject to Rule 403 – And Separate-Program Evidence is not Scheme Evidence.

Ms. Meadows does not dispute that a "scheme to defraud" is an element of § 1347, or that the Government generally may offer evidence of uncharged executions of the charged scheme. But two limits apply.

First, the Government's lead authority is not binding and preserves Rule 403. The Government relies almost entirely on the Fourth Circuit's decision in *Bajoghli*. That decision is persuasive at best; the Eighth Circuit has not adopted its holding that uncharged-execution evidence is categorically "intrinsic" to the scheme element. Even *Bajoghli* itself confirms that a district court retains broad-ranging discretion to manage trials and limit proof that is, for instance, overly duplicative. *United States v. Bajoghli, 785 F.3d 957* (4th Cir. 2015). Rule 403

therefore continues to govern the volume of uncharged-execution evidence, and the Court should hold the Government to reasonable limits.

Second, separate-program (IHS) evidence is not proof of the charged HSS scheme. *Bajoghli* addressed uncharged executions of the same scheme charged in the indictment. *Bajoghli*, 785 F.3d 957 (4th Cir. 2015). It does not authorize importing a different program's alleged fraud under the banner of "scheme" evidence. The Superseding Indictment alleges a scheme to defraud the HSS Program. Conduct in the IHS Program is outside the charged scheme's boundaries and remains governed by the intrinsic-evidence and Rule 404(b) analysis in Parts I and II above. *Alvarez-Sorto*, 160 F.4th 930 (8th Cir. 2025).

## V. No Rule 801(d)(2)(E) Statement Should Be Admitted Until the Government Satisfies the Required Foundation.

Ms. Meadows does not dispute that Rule 801(d)(2)(E) can apply absent a charged conspiracy, as a "joint venture" or "concert of action" exception. *United States v. Miller*, 644 F.2d 1241 (8th Cir. 1981). But the Rule's foundation is not satisfied by the Government's say-so, and its brief supplies argument, not proof.

### A. The Government must prove each foundational element by a preponderance.

The Government must establish, by a preponderance of the evidence, "(1) there was a conspiracy involving the defendant and declarant and that (2) the statement was made during and in furtherance of the conspiracy." *United States v. Kitchen*, 149 F.4th 1019 (8th Cir. 2025). The court must find "that a conspiracy existed involving the declarant and the party against whom the statement is offered and that the statements were made by the declarant in the course of and in furtherance of the conspiracy." *United States v. Spotted Elk*, 548 F.3d 641 (8th Cir. 2008)) While

the court may consider the statement itself, that statement cannot be the sole proof of the joint venture. *Miller*, 644 F.2d 1241 (8th Cir. 1981).

The Government, through any filing, proposed exhibit, or discovery material, has failed to meet this low bar. Nowhere in its exhibits, cited to in filings or otherwise, has the Government established any scheme or conspiracy involving Sharmaine Meadows. They have provided accusations surely. They have provided evidence that Cradle employees falsified hours, and that Meadows became aware of that misconduct. They have provided ample evidence of formal reprimands, docked pay, and firings as disciplinary measures to those offending employees by Cradle in response to their misconduct. That is neither a conspiracy nor a scheme; it is standard, ethical, and lawful business conduct. The Government has admittedly presented evidence that Cradle billed the inaccurate hours of those disciplined employees; however, they have provided zero evidence whatsoever that Meadows either knew about those hours being billed despite the inaccuracies, or that she directed, allowed, or participated in that billing. The Government simply alleges that if it happened – Meadows must have been a part of it.

Beyond failing to establish that a scheme existed and that Meadows and the declarants of the statements sought to be introduced were part of said scheme, the Government has also failed to establish, even by a preponderance, that any of the statements that they seek to introduce were made in the course of and in furtherance of said scheme. For example, the Government cites to its proposed Exhibit 500 in support of its request. This exhibit is an audio recording of a Cradle meeting where billing was discussed. For demonstrative purposes, defense counsel has created a transcript of this recording, which is attached as Exhibit 2.[1]

[1] This transcript is AI generated from Government Exhibit 500 and is included for demonstrative purposes, citation, and ease of review only – it is not intended to be nor represented as a perfectly accurate transcription.

The transcript of this recording makes clear that the Government's categorization of the statements in this meeting as scheme evidence is baseless and without merit. The Government's position is that Davis made directive statements as to "maximizing billing." However, when viewed in the context of the meeting itself, it presents no indication of foul play – in fact just the opposite. In the meeting, the following notable exchanges take place:

At page 5, para 2-4, they discuss what advocates should be charging, the reasonableness of the charging, and discrepancies as to billing with regard to particular clients. On pages 9 and 10, they discuss how employee DelOria fell short of allowable billing hours and why. On page 12 and 13, they discuss an instance of overbilling, and that Cradle administration identified and deducted from the payroll timecard the two overbilled hours claimed by the employee. This exchange reads in relevant part:

> Speaker 3 (**29:29**):
> But what happened was I, um, took off two hours off each one of her time card because she was over billing for one of the clients, so I had to scratch two hours off of each time card. Sheila Wilson? Mm-hmm. No, correct. Who was it? Sheila Wilson.
>
> Speaker 1 (**29:51**):
> Uh, she was, she was over billing for Sheila Wilson.
>
> Speaker 3 (**29:57**):
> She was doing three instead, she was doing five instead
>
> Speaker 1 (**30:01**):
> Have we talked to Kenya about this?
>
> Speaker 2 (**30:07**):
> Yes.
>
> Ex.2, p.13

On page 14, Latrice describes putting in more hours for client services than she either billed or got paid for – and that this scenario happens often. On page 16 they again identify

overbilling by an employee and the steps taken administratively to identify and remedy those discrepancies. On pages 17 and 18, Davis again encourages advocates to be utilizing the allotted client budget and providing them additional services – this is a directive to 'not leave money on the table' – it is in no reasonable way interpretable as a directive of fraud. He just tells the staff to do the work.

The government also cites to its proposed exhibits 306, 315, 318, 319, 320, 329, as internal communication evidence of the scheme. Again, these exhibits fail to support the Government's position. Ex. 306 is an email from Meadows to Cradle staff directing them to utilize client hours, document and account for those hours, document all work, complete customer service surveys, meet with supervisors, participate in mandatory quarterly training, and that failure to comply with those directives would result in disciplinary action. Ex. 315 simply sets forth the allotable time that can be worked for a particular client. Ex. 318 discusses issues with billing errors by employees and the steps taken to remedy those issues. Ex. 319 again simply sets forth the allotable time that can be worked for a particular client. Ex. 320 is comprised of handwritten meeting notes that are entirely conventional and innocuous. Finally, Ex. 329 is an email from Davis to Meadows discussing tasks including: charitable foundation donations, website updates, charitable backpack giveaways, Latrice to be a trainer for employees, maximizing staff hours, proper documentation, and concepts for contracted traveling nurses.

In all these exhibits, where is the scheme? Where is the fraud? Who are the alleged co-schemers? 'Maximizing hours' is a concept of profitability for the company. Profitability of a company is not illegal – it is not fraud, and it is not a 'scheme.' The government can point to not even one indicator of any illegal activity. The Government cannot and has not established either that (1) there was a conspiracy involving the defendant and declarant and that (2) the statement was made during and in furtherance of the conspiracy.

### B. The Court should follow the *Bell* procedure and make explicit, statement-by-statement findings.

Under the governing Eighth Circuit procedure, statements may be admitted only conditionally, "subject to the proponent establishing the foundational elements during the course of trial," and "[a]t the conclusion of the evidence, the district court must then make an explicit finding as to whether the proponent established the foundational elements; if not, the district court must determine the proper remedy," including "an instruction striking the conditionally admitted statements or, where necessary, a mistrial." *Spotted Elk*, 548 F.3d 641 (8th Cir. 2008). The model is a hearing at which the court finds, as to each statement, that the declarant and the reporting witness were members of the joint venture and that the statement was made in furtherance of it. *United States v. Ragland*, 555 F.3d 706 (8th Cir. 2009). Ms. Meadows requests that the Court require that foundation before the statements of Mr. Davis and Ms. Ushie are placed before the jury, and that it reserve ruling on their admissibility pending that showing.

### C. Several proffered statements are not "in furtherance" of any joint venture.

"[N]ot all co-conspirator statements made during the course of a conspiracy are made in furtherance of the conspiracy." *Ragland*, 555 F.3d 706 (8th Cir. 2009). "a statement that simply informs the listener of the declarant's criminal activities is not made in furtherance of the conspiracy," and "merely informative statements and statements made simply to impress the listener" do not qualify. *United States v. Meeks*, 756 F.3d 1115 (8th Cir. 2014); *Ragland*, 555 F.3d 706 (8th Cir. 2009). The Government's third category — Mr. Davis's statements to Jovaughn Okunowo about "how the Defendant may react" to Okunowo firing Henry— is a paradigmatic non-furtherance statement: it is commentary on a personnel decision and a prediction about Ms. Meadows' reaction, not a statement advancing the submission of false claims. Statements that are a "frustration" of, rather than a furtherance of, the enterprise are

inadmissible. *United States v. Alonzo*, 991 F.2d 1422 (8th Cir. 1993). The Court should exclude such statements even if a joint venture is established.

### D. The "effect on the listener" theory cannot smuggle in these statements for their truth.

The Government argues that the statements are "independently admissible regardless of Rule 801(d)(2)(E)" as non-hearsay showing their "effect on the listener." The Eighth Circuit has squarely rejected using the non-hearsay/background theory to admit incriminating statements that will inevitably be used as direct evidence of the defendant's guilt, which the hearsay rules prohibit. *Alonzo*, 991 F.2d 1422 (8th Cir. 1993). Where a statement is genuinely offered for a non-truth purpose, "the district court must control and limit the use of background hearsay statements," and "instruct the jury as to the limited purpose." *Id.* Any statement admitted on an effect-on-the-listener theory must be accompanied by a limiting instruction and remains subject to Rule 403.

## CONCLUSION

For the foregoing reasons, Ms. Meadows respectfully requests that the Court:

1. Exclude the evidence relating to purported fraud in the IHS Program as extrinsic and inadmissible under Rules 404(b) and 403;

2. Limit the Government's financial-intermingling evidence to the HSS Program claims and proceeds at issue;

3. Hold that separate-program (IHS) evidence is not proof of the charged HSS scheme, and that the volume of any uncharged-execution evidence remains subject to Rule 403;

4. Require the Government to establish the Rule 801(d)(2)(E) foundation for each proffered co-schemer statement, under the *Bell* procedure, before any such statement is presented to the jury, and exclude statements that are not in furtherance of any joint venture.

Dated: September 18, 2026

Respectfully submitted,

**WOLD LAW**

/s/ Peter B. Wold
Peter B. Wold, Atty. ID. No. 118382
331 Second Avenue South, Suite 705
Minneapolis, Minnesota 55401
612.341.2525

# Exhibit 1

# US v. Meadows Subpoena

Charles Cullen <charles@cullenlawoffice.com>

Fri 9/18/2026 3:36 PM

To:Peter Wold <pwold@wold-law.com>;

Good Afternoon Attorney Wold,

I represent Tony Davis, to whom your office recently issued a subpoena to testify. I am writing to you today to confirm receipt of the subpoena and respectfully request that it be withdrawn.

While Mr. Davis has not engaged in any illegal activity in connection with your client or with the business "Cradle of Love," my client has already been the subject of government questioning in this matter, including an interrogation conducted without counsel present.

The nature, subject matter, and circumstances of that questioning make it clear that my client is being treated as a target rather than a neutral witness.

Under these circumstances, the only prudent course of action for Mr. Davis is to invoke his rights under the Fifth Amendment, and to decline to testify. My understanding is that, if called, Mr. Davis will assert his right against self-incrimination as to all substantive questions bearing on this matter.

As you know, this privilege protects the innocent no less than the culpable and Mr. Davis' invocation reflects the posture the government appears to be taking towards him. It is not an admission of any wrongdoing.

Because my client will invoke the privilege, his appearance would yield no admissible testimony and would serve no evidentiary purpose. In the interest of avoiding an unnecessary appearance and the attendant burden on all involved, I am respectfully asking that you withdraw the subpoena.

Thank you for your time and for your attention to this matter. If you need to reach me, I am available at the office number below or on my cell at (404) 772-5674.

Best Regards,

Charles

--

**Charles W. Cullen**
Founding Attorney
Cullen Law

404.492.9852
charles@cullenlawoffice.com
https://www.cullenlawoffice.com
12705 Century Drive
Alpharetta, GA 30009

Please be advised that this e-mail and any files transmitted with it may be confidential attorney-client communication or may otherwise be privileged or confidential and are intended solely for the individual or the entity to whom they are addressed. If you are not the intended recipient, please do not read, copy or retransmit this communication but destroy it immediately. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited. We do not waive attorney-client or work product privilege by the transmission of this message.

DEFENDANT'S EXHIBIT
032
26-CR-90

# Exhibit 2

This transcript was exported on Sep 16, 2026 - view latest version here.

Speaker 1 (00:05):
Where's Latrice?

Speaker 2 (00:08):
I'm not sure.

Speaker 1 (00:12):
Ray, you don't know where Latrice is?

Speaker 2 (00:16):
I had just texted her about her printer, so.

Speaker 1 (00:22):
All right. Okay, so she never came into the office today?

Speaker 2 (00:30):
Uh, she came in this morning, I guess. She told me that she was here, but she wasn't here when I got here.

Speaker 3 (00:44):
Who are we talking about?

Speaker 2 (00:45):
Latrice.

Speaker 4 (00:47):
Uh, where she at?

Speaker 2 (00:48):
I'm not sure.

Speaker 1 (00:50):
Oh, so you don't know what she. Good morning, y'all. Good morning. Oh,

Speaker 4 (01:06):
You were

Speaker 1 (01:07):
Singing? Yeah.

Speaker 2 (01:13):
She said, she said that she's in, she's just, I don't know, she's having issues, I guess.

Speaker 4 (01:21):
I don't see her.

Speaker 2 (01:22):
I saw

Speaker 4 (01:23):
Jim just popping in and out.

Speaker 2 (01:24):
Yeah. Hold on.

Speaker 4 (01:28):
Y'all need me to hang up and call her and jump back in?

Speaker 2 (01:32):
No, hold on.

Speaker 1 (01:49):
Wait a minute. Wait a minute. Wait a minute. <laugh>

Speaker 4 (01:54):
Wait a minute. I accidentally hit my camera again. I'm sorry y'all. Y'all know I'm at the water park with my baby. It's her birthday. Y'all can all tell her happy birthday since y'all all here.

Speaker 2 (02:08):
Happy birthday.

Speaker 1 (02:19):
Happy birthday. Thank you.

Speaker 2 (02:23):
Happy birthday.

Speaker 1 (02:25):
Thank you. <laugh> So cute.

Speaker 2 (02:28):
She's so ready. <laugh>

Speaker 3 (02:32):
Yes.

Speaker 1 (02:33):
So if we can get. What about Renee? Ms. Latrice and Renete. I know, uh, what's her name? Renisha.

Speaker 2 (02:46):
There we go.

Speaker 4 (02:49):
I

Speaker 1 (02:49):
Know, uh,

Speaker 4 (02:50):
Renesha must be in a training assignment.

Speaker 2 (02:53):
Yeah,

Speaker 4 (02:53):
She has a training she said from 11 to three.

Speaker 1 (02:59):
Okay, let me see here. How many people she got in training?

Speaker 2 (03:06):
She just had one person leave and then another person came in.

Speaker 1 (03:12):
Oh, so she, they, she did doing together. They doing going some tanks.

Speaker 2 (03:17):
Yeah.

Speaker 4 (03:21):
Yeah, but, um, what she said is that they're in 20 minutes gonna be starting the housing portion of it.

Speaker 1 (03:30):
Uh-huh <affirmative>.

Speaker 4 (03:31):
So they'll be going over housing, so that's why she's not able to join this meeting.

Speaker 1 (03:36):

Okay. And what about Renee?

Speaker 4 (03:39):

I can call her real quick. So I'll jump off and I'll be right back.

Speaker 1 (04:08):

Who, who is, who are, uh, when they come in and y'all have discussion? About their clients. This when they come in and y'all have discussion about their clients?

Speaker 3 (04:21):

Yeah, and they're supposed to be doing our HSS training.

Speaker 1 (04:27):

Okay. And they doing that HSS training with Renisha?

Speaker 2 (04:30):

Yes.

Speaker 1 (04:32):

Okay. So we're riding until they, uh, start popping in or whatever.

Speaker 3 (04:38):

Okay.

Speaker 1 (04:38):

Um, because hopefully. I already know Latrice got on. I'll wait on top of this one, so it's gonna be a quick call anyway. Okay. So I know we got a few minutes, you know. What Latrice do? I said I already know you gonna be on top of this one, so, uh, this gonna be a quick call. Oh no, I don't hear, I don't hear no feedback.

Speaker 3 (05:05):

This, this one was easy. We did have hardly any problems this payroll.

Speaker 1 (05:09):

Okay. All right, so we wait uh, analysis on payroll and stuff like that. Say it again. So, uh, when get back on, we can rock and roll on this 10 minute meeting. Uh, Renete, if you will, can you bring up y'all track to see why Sharmaine come back? And then she disappeared. She had called me. I just got back home. Uh-huh <affirmative> Okay. There she go. She's back. Charmaine.

Speaker 4 (08:04):

You beat me here and I was trying to call you. <laugh>

Speaker 1 (08:08):

Go off to call her. She on the phone.

Speaker 4 (08:12):

I'm on hold with the school board. She sure didn't answer my call. <laugh> I'm on hold with the school board. Okay.

Speaker 1 (08:23):

So, uh, let's get rock and roll. Y'all know that the normal format of this is kind of the payroll and so we just need to verify, you know, what we gotta have for payroll. Um, so, uh, so Ray, at this point, you're probably familiar with the format of this, and it's, it's really meant just to verify how we track them with, um, the advocates, um, chargeability and what they actually should be charging and the reasonableness of what we doing. Okay?

Speaker 2 (08:57):

Mm-hmm. <affirmative>.

Speaker 1 (08:58):

Uh, so, Latrice, I'm going down your, your list. So I first pull up, um, we got, we usually skip over admin, but I'm starting to realize we need to start including them in our evaluation because last time I think we had a discrepancy. Uh, so this time I see 72 hours for Bernicia, but, uh, quick time say 95. And I'm thinking the reason is because y'all should tell me the reason.

Speaker 3 (09:42):

I don't know the reason because I verified. I just got the papers on my desk and it's, I got 72 hours unless something was put in there afterwards. What weeks are you looking at, Tony?

Speaker 1 (09:56):

Well, I'm looking at, uh, click time list as of August 1st, um, noon. Yeah?

Speaker 3 (10:11):

No, we got, we going, um, July, um, 10th, I wanna say to the 23rd.

Speaker 1 (10:19):

That's right. I agree with you. What, but more so over, um, Renisha on the phone. I mean, uh, Bernisha on the phone. Bernisha, should it be 72 or 95 or?

Speaker 3 (10:42):

No, I have those clients that's at the bottom of the page that, um, I had to service that week that's on that QuickTime. So that's the reason why it's, um, that amount. But should have more, I should at least have 80 and then with those clients that I service, I'm not sure why it's only 72. I haven't seen payroll. I,

Speaker 1 (11:05):

I, uh, I remember we talked and we had about six or seven clients that you said that you hadn't got, um, placed yet. And so we wanted to start engaging them. That's the client you're talking about, right?

Speaker 3 (11:24):

Yep. Absolutely.

Speaker 1 (11:25):

Yeah. Okay. So, uh, that's what made it look suspicious to me when you said, when I seen the 72. But, uh, when y'all reviewed it, um what did y'all discuss about Bernisha?

Speaker 2 (11:48):

Are you talking about the 15 hours that are logged in on Saturday the 16th that's added to the regular 40 hours she bills for?

Speaker 1 (11:57):

I don't know where they've added.

Speaker 2 (12:00):

There's eight hours a day for five days a week generally. And then on Saturday the 16th, there are five clients for three hours a piece. Um, I mean, they're logged under as office hours. Is that what the discrepancy is? Should they be logged under as something else?

Speaker 4 (12:21):

So if I can, I do remember seeing an email that, and Bernisha, you could correct me if I'm wrong, that she sent in that we had, I think it's two clients that do not have an advocate and she was going to work on those two clients until we were able to get them, uh, with an advocate so that they won't just be sitting there waiting.

Speaker 2 (12:43):

Mm-hmm.

Speaker 1 (12:43):

<affirmative>. Yeah.

Speaker 3 (12:45):

Yeah. Is there a total of, let's see five, six. That's just six of them. I, that was that week next week. Even the clients, like, uh, they hadn't been assigned to Jordan Peterson to Kathy Jennings. Yeah, but though we have six clients that I have been in contact with since we've been.

Speaker 1 (13:08):

So, so I think that what, I think that those are maybe legit hours. I just think it's how we may have put it on the time sheet. So right? Is that what you're thinking?

Speaker 2 (13:22):

That's what I'm thinking because that's put in as office administration hours rather than as whatever the IHS or the HSS hours.

Speaker 1 (13:30):

I don't think, uh, I don't think Ren - well, would Renisha have access to those clients and - No,

Speaker 3 (13:38):

I, I actually told her to put them in right there under off - like the, it's a dropdown, the office and put them in. What I'm saying is I would see them regardless. I think it was just of the timing of when she honestly went back and put them in because I knew about the clients that she even mentioned them to me, but I think it was just all in the timing of when she put them in. Maybe we pulled time cards already and reviewed them already. And then I just didn't know she went back and put them in, but she did mention to me about her putting them in and I told her to go put them in, but I didn't know that they were going to go that far back to putting hours in, so I didn't go look at them because I had already pulled time cards in and we had already reviewed them.

(14:16):

So I think it's just a matter of time and that's all it was, a matter of timing.

Speaker 4 (14:23):

Excuse me, can I, can I ask a

Speaker 3 (14:25):

Question please? My question is for Renesha. So those, those, I just want clarification. Those clients are, are you doing a time sheet on the, the things that you have done on the client or you're actually acting as being, what's that? The notes on the file of those clients. Yes, yes ma'am. Okay. That's what I'm saying. Are you as an admin or are you acting as an advocate? When I'm servicing those clients, I'm acting as advocate. What do you mean servicing it? Reaching out to different departments to see what's available. Okay. Letting the clients know what I found, making sure they're able to afford different, just doing my partner - Okay. To get assigned. Okay. Yeah. I didn't know you were doing that type of stuff. I'm, I just wanted clarification. I didn't know. And I, I think - I didn't know you was doing that.

Speaker 1 (15:30):

I think the reason why, because we was kinda, uh, low on advocates to get people assigned to -

Speaker 3 (15:35):

Oh no, that's understandable. I ju - I was just making sure that when we are having a staff document what they were doing, I just wanted the clarification. So she is acting as the advocate. I didn't want any. That, that's all I needed was some clarification. That's all. I didn't know you were doing it, so I just wanted to know. Thank you.

Speaker 1 (15:58):

Okay. So, uh, but so right, what this tell me is that y'all ain't talked about this yet.

Speaker 2 (16:08):

I had talked about on this past Tuesday, last week, that I wanted everyone to submit to me their time cards if they were working with clients by the end of the week. Um, Bri emailed me asking for the time card to be resent to her because nobody in the office had one. So I gave her that and I, we're gonna

have our meeting this week. So the meeting that we had last week regarding these time sheets, that was not included, no.

Speaker 1 (16:41):

Okay. Uh, okay. So let's go down to the next one. Right?

Speaker 2 (16:49):

Correct. Her, her client, Kirk, is assigned to Kenyatta now. So she finished, um, with Kirk and Johannes the first week of this t- time period. So she had five hours and then this last one she logged away three hours before she called in this, uh, the 25th and indicated that she wanted her client moved and that she wouldn't be coming back.

Speaker 1 (17:14):

So, uh I don't see Johannes on the.

Speaker 2 (17:23):

It's on, uh, the time sheet from July 10th to July 16th. She put in two hours with Johannes.

Speaker 1 (17:30):

Right. So based on my time sheet, Johannes belongs to somebody else. A-

Speaker 2 (17:38):

According, according to the spreadsheet, yes.

Speaker 1 (17:41):

Yeah. And so I also got Johannes being charged from two different employees.

Speaker 2 (17:49):

He was being transferred, I believe. And so, um, this is right before I started keeping track of all of this stuff, um, that transfer was going on. And so the, the spreadsheet was not reflecting what was actually happening at that point. So the information that I have thus far shows that as far as I knew, the only person on the spreadsheet was Kirk. Um, and so the discrepancy with Johannes was that he was getting pu - moved over to somebody else. Uh, it said notes indicate client terminated service with advocate over misunderstanding. Should have been in person conversation and phone call could have been directed in that way. So I'm not 100% sure what happened, but it sounds like there was an issue.

Speaker 1 (18:34):

So Johannes, so then Johannes was working with who, Kenyana and she didn't like him?

Speaker 2 (18:43):

No, I think he was, he was working with Coralis and then sh - they had an issue. But I'm not sure. Yeah, I'm not sure. Let me pull up Kenyatta's folder and I can tell you for sure. So

Speaker 1 (18:56):

Because I got time sheets with Kenyatta claiming Johannes and with Coralis claiming Johannes. So I just want to make sure who, make sure that y'all are in tune with did both of them serve as Johannes or -

Speaker 2 (19:10):

So the week, the week that you're talking about is when it was in transition. So Coralis talked to him and then Kenyatta initiated her con - or her, her service with him that same week. Okay. So it was just at the beginning of the week, Koralis did her three hours. At the end of the week, Kenyatta did her three hours.

Speaker 1 (19:27):

Okay. Okay. Let's go to Deloria. Deloria, Deloria, we got 47 hours on 32 hours, which means I'm expecting Deloria to charge 64 hours in IHS versus 47. She also got 28 hours in transitional, uh, in addition three and a half hours on billable time. So why did the lawyer work, um, 47 hours versus the 32, I mean versus the 64 that she was allotted? So that, what that's telling me is we're leaving about 17 hours of billable time on the table, um, for Deloria's time. Um, why is that? Is it because she was too busy doing transitional or what?

Speaker 2 (20:29):

Uh, last week she logged eight hours, um, as office admin work. So what she did was she took the transitional move folders and files that she had in receipts and things like that and organized them and put them into a space where we could, she was gonna come in and we're gonna put them into the shared drives. So she did the legwork of organizing the physical files.

Speaker 1 (20:55):

Okay. And that was last week, so that this would have been, um, not included in these

Speaker 2 (21:01):

Hours. No, no. I, I mean the, the second week of this pay period. So between the 17th and the 23rd.

Speaker 1 (21:07):

Okay. So she got three and a half hours non-billable. I'm fine with that. My issue is that she's charging first is, the issue is twofold. Um, her time sheets reflect 76.5 hours. Her payroll is 78.5, so there's two hours there, not to be petty.

Speaker 3 (21:30):

Oh, I think it's because a lot of the people, um, didn't put their, um, monthly meeting on a time card, so we just added them in there for them because a lot of people didn't do it and they were there present. So the ones we, because we used to do it that way. We used to, to go by the sign-in sheet and I think they still just, um, used to doing it that way, so they don't put them on a time card. So the people that we knew that was present, we added the two hours to their time card.

Speaker 1 (22:00):

Okay.

Speaker 3 (22:00):

Yeah.

Speaker 1 (22:02):

And, uh, Charmaine, you good with their methodology or what? Are you busy? Okay, we'll come back to that. I was

Speaker 4 (22:19):

Trying to figure out how to answer that because I'm on my tablet, not on my phone and I couldn't find the microphone. So yeah, I know y'all found my finger trying to find. Yeah. But <laugh> what I was saying is, yes, I am okay with that for this time before the meetings moving forward, if we can have them just included so that we can have records when they submit their time. I mean, you can still have them sign in on the time sheet so y'all can see real time who was there, but for the sake of billing, let's have them make sure they put it in their click time.

Speaker 2 (22:55):

Not a problem.

Speaker 1 (22:57):

Y'all good with that?

Speaker 2 (22:57):

Mm-hmm. <affirmative>.

Speaker 1 (22:59):

Okay. So, um, I still need an answer on why Deloria working, um, only 70% of the time she's supposed to work on billable IHS hours. Uh,

Speaker 2 (23:13):

As far as the other people that she billed for less, I mean, her notes cover why she didn't do her full 20 hours with like Julie Townsend. Um, uh, otherwise, you know, she's li - the second week she did everything except for the four hours with Julie. The first week of the pay period between the 10th and the 16th, she only did 11 with her, but I mean, it, it's in there. So, uh, the, that first week, there were kind of, there's some discrepancies between the click time and the spreadsheet that got cleared up on the following week. So I wasn't 100% sure what was accurate as far as the spreadsheet goes for the 10th to the 16th, but, um, this, this one, uh, the 17th to the 23rd, it looks like she was, she was on par. It was just, because it's an IHS client, then she only spent 16 instead of 20 hours with her.

(24:12):

Uh-huh

Speaker 1 (24:13):

<affirmative>. Uh, my only concern is that she's so busy doing transitional that she's not really getting to the, uh, IHS

Speaker 3 (24:25):

Hours.

Speaker 2 (24:26):
Okay.

Speaker 3 (24:27):
Um, I don't know. I'm, I'm, I'm not really sure because they, um, that handles in a weekly meeting, but as far as what I know about Nikki, she's really attached to her IHS client and I don't really think she would put them on a back burner for transitional. I really believe it's just that they're not doing all of their hours. And without knowing one of her clients always in the hospital

Speaker 2 (24:48):
Too. Mm-hmm. <affirmative>.

Speaker 4 (24:50):
Excuse me, can I interrupt one moment. Is anyone in the office for the meeting?

Speaker 2 (24:58):
Uh, let me check. No. The only person who's here is the person for training.

Speaker 4 (25:20):
Okay.

Speaker 2 (25:22):
Um, but I haven't checked the, the Google Meet.

Speaker 3 (25:30):
Let me check.

Speaker 1 (25:39):
Okay. So, uh I'm not, these, these are questions I'm posing. Like I don't know the answer, right? Mm-hmm. <affirmative>. These are questions I'm posing, but this is stuff that I want y'all to be good with. We try to maximize billings, so if somebody's charging 17 hours less than what we expect them to charge, I think that's material enough to know, you know, y'all do y'all, during y'all discussions to know why that's occurring.m. Y'all get what I'm saying?

Speaker 3 (26:09):
Mm-hmm. <affirmative>.

Speaker 1 (26:12):
That's a material amount of hours. Um, so, uh, we'll move on. So Deanna, Diana is no longer here, right?

Speaker 2 (26:21):

Correct.

Speaker 1 (26:22):

Okay.

Speaker 2 (26:23):

She has hours for the 10th to the 16th. She did 20 hours, um, with her seven clients, and then we moved everybody except for two people, um, to other people. So between Princeton, Tamika, and Shanara, we've moved her clients. Bri is taking over the other two who don't have, uh, advocates yet? Um. Peters- Peterson and Jennings are the two.

Speaker 1 (26:57):

And Jennings, yeah, okay. Um, Jackie, Jackie's got 38, so we expect 36 hours from her, and she got 33.

Speaker 2 (27:14):

Yeah, I don't know why she's so low. Yeah, she, her

Speaker 3 (27:17):

Clients are new. She got those clients from some of the people that left, and, um, she, at first, I think she only had three clients, um Carlos, and Lor- Lorraine, and now she got more clients due to, um, other people leaving. Like Ashley, she been here for a while, but Ashley's been out of town, um, with her family, so she hadn't done her 20 hours, and they were supposed to have been, um, doing a follow-up with Ashley about when she want her hours started, but other than that, her hours is correct, uh, if you take Ashley out of the equation, which went out of town with her family for the summer.

Speaker 1 (27:57):

So, um, Ashley with the 20 hours, okay. Yeah,

Speaker 2 (28:03):

Dansby.

Speaker 1 (28:09):

About 36 hours, okay. Um, let's go to Caleb. Caleb got, uh, so Caleb still got on Caleb. So he got, uh, 11, 22 hours and 20 in IHS, 17 and 22, okay. Uh, 42 versus 41, okay, I'm all right with that.

Speaker 2 (28:58):

She's right on par.

Speaker 1 (29:01):

82 hours and she got 79 and a half, um -

Speaker 2 (29:08):

I, I have, I have 83.

Speaker 1 (29:13):
I got 79 and a half with three non-billables. Okay. So

Speaker 2 (29:17):
There's

Speaker 1 (29:17):
76 and

Speaker 2 (29:18):
Half.

Speaker 1 (29:18):
Yes,

Speaker 2 (29:19):
I, I hear you.

Speaker 1 (29:21):
But I also got 83 in three times, so what's the difference?

Speaker 2 (29:25):
Okay. That's, that's just the office meetings then.

Speaker 3 (29:29):
But what happened was I, um, took off two hours off each one of her time card because she was over billing for one of the clients, so I had to scratch two hours off of each time card. Sheila Wilson? Mm-hmm. No, correct. Who was it? Sheila Wilson.

Speaker 1 (29:51):
Uh, she was, she was over billing for Sheila Wilson.

Speaker 3 (29:57):
She was doing three instead, she was doing five instead

Speaker 1 (30:01):
Have we talked to Kenya about this?

Speaker 2 (30:07):
Yes.

Speaker 3 (30:08):
Yes. He's in the office as well.

Speaker 1 (30:16):

Okay. Uh, Latrice, your own time don't match your quick time. Is the hours that you submitted the real hours that you're saying billable? The

Speaker 3 (30:28):

Hours I submitted always my real hours. I just never, always just bill at the same exact hours.

Speaker 1 (30:33):

Okay. So you telling me you putting in more hours than you actually, uh, charging us for? All the time. <laugh> That shouldn't be, that shouldn't be the case. You need to see what you're doing, uh, that you are not working over the hours. So if that's the case, then Sarah would need to figure that out. Right?

+++++++

Because I don't want her working 97 hours and only getting paid for 84 of them. If she work 97 hours, she needs to be compensated for 97 hours, but I need to know they justify.

++++++_+++

Speaker 2 (31:10):

Mm-hmm.

Speaker 1 (31:12):

All right, that's really all of them. Uh, Lisa billable in her, in her group.

Speaker 2 (31:28):

She put two, two for each meeting.

Speaker 3 (31:31):

Yep. The team meetings every, the weekly meetings and that was then got a monthly meeting too. Mm-hmm.

Speaker 1 (31:36):

Okay. So she, she's just doing her right thing. She doing what she's supposed to

Speaker 3 (31:39):

Do.

Speaker 1 (31:41):

Yep. Um, so she got 29 and a quarter hours, but I think she's supposed to have 42.

Speaker 3 (31:52):

I think she had a couple of new clients too.

This transcript was exported on Sep 16, 2026 - view latest version here.

Speaker 2 (31:54):

Mm-hmm. Yeah.

Speaker 1 (31:59):

There

Speaker 2 (32:00):

Were, there were three of them that were, um, waiting for approvals. Or at least one of them that was waiting for approvals and two of them who are new that she's trying to get in contact with.

Speaker 1 (32:10):

Okay.

Speaker 3 (32:26):

Gates is newer. Frank may have, I think it's, um, Blake Olsen just got added back to her because he just got his, um, thing renewed. Um, and then the two that she just, um, got added back and added.

Speaker 1 (32:42):

Okay. I'll go with it. Uh, Preston, he has 20 hours. Uh, let me. <laugh>

Speaker 4 (33:13):

I was trying to see.

Speaker 1 (33:14):

Yeah. <laugh> Okay. So it looked like Preston is supposed to be at about 40 hours and he got 20.

Speaker 2 (33:28):

So the spreadsheet is updated for recent, but these, this is new for him. The, the purple one is moved over. Um, the, Desiree Johnson has been in the hospital and so he hasn't been logging hours, not in these two weeks that we're looking at. Um, and he was trying to get a hold of Eliahu for that week of the 10th. Okay. Eliahu I guess has been on and off of his meds and difficult to keep track of. So he's doing his best as far as that goes. It looks like he's got it kind of under control within the last two weeks.

Speaker 1 (34:07):

Nice. Okay. Uh, next week got, uh. She got, she got 68 with two non-billable. I can go with it. Uh, Shanara, 35.75. Why she don't get, she didn't come to the meeting I guess. Nah. She didn't come to the team meeting.

Speaker 2 (34:43):

Uh, for one of the weeks? Mm-hmm.

Speaker 1 (34:46):

Shanara, the team meeting. She was there?

This transcript was exported on Sep 16, 2026 - view latest version here.

Speaker 2 (34:49):

No.

Speaker 1 (34:50):

No, okay. Uh, well Shanara got 27, so she should be at 54. She got 35, including non-billables. What's going on with her?

Speaker 2 (35:11):

There are three people who she and other advocates before her have a hard time getting a hold of. Um, so she's not able to bill for them. They're, they're going through the process of being put on hold, I think. Bree would have to say for sure.

Speaker 4 (35:27):

Yeah,

Speaker 1 (35:28):

They are. And we don't, we don't reach out to those three people?

Speaker 3 (35:32):

Yes. Dolores, Bills and Charlotte.

Speaker 1 (35:35):

Beautiful. Okay. Um, are we tracking, we tracking the communication on them.

Speaker 3 (35:44):

It should be on the notes, but I'll go back and double check.

Speaker 1 (35:46):

Okay. Uh. I know she okay. Got 109 with three non-billables. So, uh, with Tamica, are we okay with her client? Is she over billing or what?

Speaker 2 (36:17):

She, she went over on the second week just because the reductions hadn't been communicated to her yet by that point. So the hours that she billed for the week of the 17th are, as far as she knew, they're correct. And so the, this, this week of the 25th should reflect those reductions.

Speaker 1 (36:40):

Okay. So she got people that really, uh, coming to the meeting and that service agreement. Mm-hmm. Okay. And you know who they is and what they doing?

Speaker 2 (36:53):

Yeah.

Speaker 1 (36:54):

Okay. Uh, and then last not least, Valencia, she was like 25 and she got 1020, that's beautiful. Okay. Uh, much better I think there was some sync ha - syncing, syncing up happening. Um, either that or some good notes have been taken and, uh, and able to, uh, speak to the payroll hours. I don't feel like y'all went through this exercise like this. However, I do feel like that the communication that y'all been doing, y'all, y'all able to get through the meeting, which is great. Um, well, I ain't gonna say great. It's good. I, I would like to be able to understand why we not maximizing hours and having justification as to those hours that we can't maximize on. Um, and we was able to get through that. Go ahead. Okay. But, uh, all in all I think is a much better sync up of the payroll.

(37:59):

Uh, I do think, you know, it's that, it's there some more improvement that could be made. Um, but I'm okay with it. Uh, you got anything else?

Speaker 4 (38:11):

One moment. Please hold.

Speaker 1 (38:15):

On mute. Okay, but here's the other, here's the other step that I didn't really bring out on the call, um, that I know is happening and I want y'all to pay attention to, you know, on the go forward. Uh, we need to pay attention to people who are not, um, basically using the allotted budget that we got set out for them. So in other words, their, their monthly run, their weekly run, run rate is not enough to, um, utilize all of the budget by the end of their service agreement, right? Yeah, I get what I'm saying when I say that,

Speaker 2 (38:58):

Right?

Speaker 1 (38:58):

Mm-hmm. <affirmative>. That was a lot. So I think it, y'all know, we ain't gotta go through the spiel what we need to be doing about revenues and getting income in and all that. So I definitely think this is an exercise that y'all need to go through to make sure that, to make sure that, uh, people are using the right, the right run rate, um, so we can utilize their full budget by the end of their, um, service agreement.

Speaker 3 (39:26):

Yeah. No, when they, when we get clients, even, um, new clients that remember we was saying how they come in and sometimes they come in and may and they service agreement over in October. Every time we get new clients, whether it's housing clients, ILS clients, I always, um, do the hours and then submit it to Bernisha to assign and we, she recheck them and make sure they are right and, but I always do that. And even if we have a client who's been on hold for a while, when they do, um, come back, uh, redo their hours because I know they can go up some more so we can maximize hours. I, I do that all the time, so.

Speaker 1 (40:07):

This transcript was exported on Sep 16, 2026 - view latest version here.

Okay. Um, and make sure that's communicated to the advocates so they know they need to spend more time with them or whatever. Uh, if we got issues with the client, you know, so Ber- Bernicia know to reach out to them and, and see what the issue is, the reason why they're not working. Uh, Latoya found several instances that I won't, that we ain't gotta bring out on this call because I ain't really give you out there, but several instances where people are kind of barely, um, utilizing the budget that they have allotted. Um, and one of my, one of my issues with, uh, one person in particular, I ain't say an issue, uh, Deloria, I think she's just doing a lot. I, I believe, I definitely think, don't get it wrong, I think Deloria is doing her thing. Um, but with her having the max load for IHS clients and still doing a transitional, I feel challenged if that is too much for her and if we need to be reassigned to some of her tra - her IHS clients.

(41:13):

Um, but if y'all tell me this is, she got it, it ain't too overwhelming for her, she can do it, uh, that's fine, but I'm seeing a consistent under, uh, usage of her IHS hours, uh, and it's really being backfilled by transitional hours. So, I mean, that's just one case, but I just think y'all need to pay attention to that. Uh, but, uh, all in all, I'm good. You got any, uh, anything? Charmaine?

Speaker 4 (41:48):

I do not have anything. I muted you. <laugh> Oh, there she go.

Speaker 1 (41:59):

She don't, we done heard you, uh, beating on kids and everything and now you meet. <laugh>

Speaker 4 (42:10):

Well, once I figured that I had that ability, I went ahead and muted her. I didn't know I had better. I muted her. I didn't know I had that ability.

Speaker 1 (42:19):

See how you got people. You got people, see?

Speaker 3 (42:23):

Yeah. Um, I don't know. I do have something I wanna bring up, but I'll probably just talk to Bri and Serray separately, but I think that's it.

Speaker 1 (42:36):

All right. Cool beans. Well, if that's it, that's all I got.

Speaker 3 (42:41):

Real quick. I gotta just ask a question. I don't. <laugh>

Speaker 1 (42:50):

It's my beat, you know what I mean? <laugh>

Speaker 4 (43:02):

Better places. Bye.

This transcript was exported on Sep 16, 2026 - view latest version here.